T.C. Memo. 2005-91

UNITED STATES TAX COURT

MICHAEL K. BERRY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10804-03.                    Filed April 26, 2005.

P and X were divorced in California.  The San
Diego County Superior Court awarded P and X joint legal
and physical custody of their two minor children,
designated X as the primary caretaker of the children,
and ordered P to pay monthly "family support" (combined
but unallocated spousal support and child support) to
X.

In 1999, P paid X $49,808 in respect of his family
support obligation, consisting of (1) 12 monthly
payments of $3,832, and (2) an additional $3,824
attributable to P's arrearage from prior years.  Also
in 1999, P paid two court-appointed psychologists
$4,302, $4,188 of which the San Diego County Superior
Court subsequently (in 2001) credited to his arrearage.
P contends that all of those payments ($54,110)
constitute alimony as defined in sec. 71(b), I.R.C.,
and that he is therefore entitled to deduct those
payments pursuant to sec. 215, I.R.C.  R contends that
none of the payments at issue qualifies as deductible
alimony.

The primary dispute between the parties is whether P's family support payments satisfy sec. 71(b)(1)(D), which provides that a cash payment meeting the requirements of sec. 71(b)(1)(A)-(C) is alimony only if (1) there is no liability to make any such payment for any period after the death of the payee spouse ("continuing payment" liability) and (2) there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse ("substitute payment" liability).

Held: P had no continuing payment liability, as contemplated in sec. 71(b)(1)(D), with respect to the family support payments at issue.

Held, further, a payor spouse's general State law obligation to continue supporting his or her children in the event of the payee spouse's death does not, in and of itself, give rise to a substitute payment liability, as contemplated in sec. 71(b)(1)(D), with respect to an unallocated support obligation such as California family support.

Held, further, P had no substitute payment liability, as contemplated in sec. 71(b)(1)(D), with respect to the family support payments at issue.

Held, further, P is entitled to an alimony deduction for 1999 in the amount of $49,808, consisting of the 12 monthly payments of $3,832 ($45,984) and the additional $3,824 payment attributable to his arrearage; P is not entitled to any alimony deduction for 1999 in respect of his payments to the court-appointed psychologists.

Held, further, P is liable for the addition to tax under sec. 6651(a)(1), I.R.C., for failure to file timely his 1999 return.

Gary M. Erickson, for petitioner.

James J. Posedel, for respondent.

MEMORANDUM OPINION

BEGHE, Judge:  Respondent determined a deficiency of $19,925 and an addition to tax under section 6651(a)(1) of $2,425 with respect to petitioner's Federal income tax for 1999.[1]

After giving effect to various concessions,[2] the issues remaining for decision are:

1.  Whether petitioner is entitled to an alimony deduction of $54,110 for his 1999 tax year under section 215.  We hold petitioner's deduction is limited to $49,808; and

2.  whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file timely his 1999 return.  We hold petitioner is so liable.

In deciding the first issue, we hold that the fact that a payor spouse's general State law obligation to support his or her

---

[1] Unless otherwise specified, all section references are to the Internal Revenue Code of 1986, as in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

[2] On Schedule C, Profit or Loss From Business, to his 1999 return, petitioner claimed deductions of $7,071 for "Office expense" and $12,096 for "Other expenses".  Petitioner concedes respondent's downward adjustments of $388 for "Office expense" and $9,569 for "Other expenses".  Petitioner agrees with respondent's determination in the statutory notice that petitioner is entitled to the standard deduction in lieu of his claimed itemized deductions.  Petitioner agrees with respondent's upward adjustments to his self-employment tax and self-employment tax deduction resulting from the increase in petitioner's Schedule C net income.  A computation under Rule 155 is necessary to give effect to these concessions and our decision.

children survives the death of the payee spouse does not, in and of itself, cause all or any part of an unallocated support obligation (such as California family support) to fail to qualify as alimony by reason of section 71(b)(1)(D).

## Background

This case is before the Court fully stipulated under Rule 122. The stipulation of facts and, except as provided below, the attached exhibits are incorporated herein by this reference.[3]

Petitioner resided in San Diego, California, when he filed his petition. During his 1999 taxable (calendar) year and at all relevant times, petitioner accounted for his Federal income tax liability using the cash method of accounting.

Petitioner and his former spouse, Carmen B. De Berry (Carmen), were married on June 11, 1983. They had two children: Anthony M. Berry, who was born on January 22, 1985, and Natalie M. Berry, who was born on July 10, 1987.

On May 5, 1994, Carmen filed a petition for legal separation from petitioner in the San Diego County Superior Court (the Superior Court), which led to a proceeding for dissolution of their marriage.

Petitioner and Carmen eventually agreed to a settlement. Petitioner's counsel recited the terms of the settlement in open

---

[3] Respondent objects to petitioner's exhibits 5 and 12 on the ground of relevance. We address these objections in our discussion.

court on June 13, 1996. The Superior Court incorporated the terms of the settlement in a judgment of dissolution of marriage dated July 25, 1997 (the dissolution judgment). In the dissolution judgment, the Superior Court ordered petitioner to pay Carmen "family support" of $4,030 per month. The dissolution judgment provided that petitioner and Carmen would have joint legal and physical custody of the two children and that Carmen would be the primary caretaker.

In an order dated March 25, 1999 (the 1999 order), relating to a hearing held on January 14, 1999, the Superior Court (1) declared that "Timeshare for the children of the parties is 42% to Father", (2) adjusted petitioner's family support obligation to Carmen to $3,832 per month effective August 1, 1998, and (3) found that, as of December 31, 1998, petitioner was $21,478 in arrears on his support obligation, which amount included $2,196 of interest.

Petitioner paid Carmen $49,808 during 1999 pursuant to the 1999 order. That figure represents 12 monthly payments of $3,832 ($45,984) and an additional $3,824 attributable to petitioner's support arrearage.

Petitioner paid two court-appointed psychologists, Drs. Caffaro and Murphy, $4,188 on Carmen's behalf during 1999. Petitioner also paid Dr. Caffaro $114 on October 29, 1999.

In an order dated March 26, 2001, relating to a hearing held on February 9, 2001, the Superior Court (1) recited the December 31, 1998, arrearage set by the 1999 order ($21,478),[4] and (2) credited the payments to Drs. Caffaro and Murphy that petitioner made on Carmen's behalf during 1999 ($4,188) against the arrearage.

On August 2, 2001, petitioner filed a Form 1040, U.S. Individual Income Tax Return, for his 1999 tax year. Petitioner did not seek, nor was he granted, an extension of time to file his 1999 return. On his 1999 return, petitioner claimed an alimony deduction of $50,528.[5]

On May 29, 2003, respondent issued petitioner a statutory notice of deficiency for his 1999 tax year. In the notice of deficiency, respondent disallowed in full the $50,528 alimony deduction that petitioner claimed on his 1999 return, on the grounds that "you did not establish that the amount shown was (a) alimony and (b) paid".

Petitioner now contends he is entitled to an alimony deduction of $54,110 for his 1999 tax year, consisting of (1) the $49,808 he paid Carmen in 1999 pursuant to the 1999 order, (2) the $4,188 he paid Drs. Caffaro and Murphy on Carmen's behalf

---

[4] The 2001 order does not appear to account for the $3,824 arrearage payment the parties stipulate petitioner made in 1999 "pursuant to" the 1999 order.

[5] The record does not reveal the derivation of that figure.

during 1999, and (3) his $114 payment to Dr. Caffaro on October 29, 1999.

## Discussion

### I.  Alimony Deduction

#### A.  Introduction

##### 1.  Statutory Overview

Generally, alimony and separate maintenance payments (hereinafter collectively referred to as alimony) are taxable to the recipient and deductible by the payor.  Secs. 61(a)(8), 71(a), 215(a).  Section 71(b)(1) defines "alimony" as follows:

> (1) In general.--The term "alimony or separate maintenance payment" means any payment in cash if--
>
> (A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,
>
> (B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,
>
> (C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and
>
> (D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse.

Section 71(c)(1) provides, however, that the general inclusion rule of section 71(a) does not apply to "that part of any payment which the terms of the divorce or separation instrument fix (in terms of an amount of money or a part of the payment) as a sum which is payable for the support of children of the payor spouse."

The parties agree petitioner's family support payments to Carmen[6] satisfy the requirements of section 71(b)(1)(A)-(C) for qualification as alimony.[7]  They disagree whether those payments satisfy section 71(b)(1)(D).  For ease of reference, we shall refer to the types of liability described in the first and second clauses of section 71(b)(1)(D) as "continuing payment liability"

---

[6] We address petitioner's payments to Drs. Caffaro and Murphy in part I.E.

[7] The parties stipulate that $3,824 of the $49,808 paid by petitioner to Carmen in 1999 "represented amounts paid by petitioner which were attributable to family support arrearages from prior years."  That language is potentially broad enough to include interest (i.e., the $2,196 interest component of petitioner's Dec. 31, 1998, arrearage), which, unlike qualifying alimony, is generally not deductible in this context.  See sec. 163(h).  The record does not reflect whether the Superior Court in fact credited the $3,824 to pre-1999 family support (principal), interest thereon, or both (or neither, for that matter, see supra note 4).  On brief, however, respondent does not distinguish between petitioner's payments of current and past due (pre-1999) family support in 1999, referring to such amounts in the aggregate as "family support", the deductibility of which turns on the application of sec. 71(b)(1)(D). Accordingly, we deem respondent to have conceded that the arrears paid by petitioner to Carmen in 1999 were family support rather than interest.

and "substitute payment liability", respectively (collectively, "postdeath liability").

### 2. Historical Context

Before we begin our analysis, some historical background would be helpful. Prior to 1984, the Internal Revenue Code described taxable alimony as "periodic payments (whether or not made at regular intervals) received * * * in discharge of, or attributable to property transferred (in trust or otherwise) in discharge of, a legal obligation which, because of the marital or family relationship, is imposed upon or incurred by" the payor spouse under a divorce or separation instrument. Sec. 22(k), I.R.C. 1939, as enacted by the Revenue Act of 1942, ch. 619, sec. 120(a), 56 Stat. 816 (the 1942 Act); see also sec. 71(a)(1) and (2), I.R.C. 1954, prior to amendment by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 422(a), 98 Stat. 494 (the 1984 Act) (similar language). The general rule of inclusion in the recipient's income did not apply to "that part of any such periodic payment which the terms of the decree or written instrument fix, in terms of an amount of money or a portion of the payment, as a sum which is payable for the support of minor children". Sec. 22(k), I.R.C. 1939, supra; see also sec. 71(b), I.R.C. 1954, supra (substantially identical language). Furthermore, except as otherwise provided, "[i]nstallment payments discharging a part of an obligation the principal sum of

which is, in terms of money or property, specified in the decree or instrument" were not considered periodic payments.  Sec. 22(k), I.R.C. 1939, supra; see also sec. 71(c)(1), I.R.C. 1954, supra (substantially identical language).

While the exception (to the general rule of inclusion) for child support did not state that only amounts "fixed" as child support in the divorce or separation instrument were treated as such for tax purposes, that was clearly the intent of Congress:

> If, however, the periodic payments * * * are received
> by the wife for the support and maintenance of herself
> and of minor children of the husband without such
> specific designation of the portion for the support of
> such children, then the whole of such amount is
> includible in the income of the wife [i.e., is treated
> as alimony] as provided in section 22(k) * * *.

H. Rept. 2333, 77th Cong., 1st Sess. (1942), 1942-2 C.B. 372, 429; S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 570.[8]  The Supreme Court gave effect to that intent in Commissioner v. Lester, 366 U.S. 299 (1961), holding that "[t]he agreement must expressly specify or 'fix' a sum certain or percentage of the payment for child support before any of the payment is excluded from the * * * [payee spouse's] income [i.e.,

---

[8] Regulations issued within 2 months of the enactment of the 1942 Act parroted the language quoted above.  See sec. 19.22(k)-1(d), Regs. 103, as amended by T.D. 5194, 1942-2 C.B. 53, 59-60; see also sec. 1.71-1(e), Income Tax Regs. (identical except for statutory reference).

is not treated as alimony]." Id. at 303 (emphasis added).[9]
Furthermore, the Court narrowly construed that requirement,
holding that language in a marital agreement providing for a pro
rata reduction in payments to the payee spouse as each child
became emancipated did not "fix" such amounts as child support as
contemplated in the statute.

The Court in Commissioner v. Lester, supra at 302,
recognized the pervasive incentive under Federal income tax law
to characterize marital payments as includable, deductible
alimony rather than excludable, nondeductible child support: "on
the other hand, the wife, generally being in a lower income tax
bracket than the husband, could * * * in the final analysis
receive a larger net payment from the husband if he could deduct
the gross payment from his income." In blessing the technique
utilized by Mr. Lester, the Court afforded practitioners great
flexibility in disguising child support as alimony for tax
purposes. As one California court explained, in the aftermath of
Lester:

> it became a common practice for spousal support awards
> to be "loaded." That is, a theoretically larger than
> otherwise spousal support payment and a correspondingly
> adjusted-down child support payment was agreed upon in
> order to take advantage of the tax laws and, assumedly,
> to provide adequately for the children through the
> supported, custodial spouse's increased income.

---

[9] In so holding, the Court relied extensively on the
legislative history of the statute, including the passage quoted
above.

In re Marriage of Leathers, 221 Cal. Rptr. 78, 81 (Ct. App. 1985) (unpublished).

As it turned out, the practice of disguising child support as alimony for tax purposes conflicted with California law requiring adequate child support awards. Id.; see In re Marriage of Ames, 130 Cal. Rptr. 435 (Ct. App. 1976). As the court in In re Marriage of Leathers, supra at 81, continued:

> Not surprisingly, the twain of good tax breaks and good domestic relations law did not meet for long. In In re Marriage of Ames [citation omitted], the Court of Appeal for the Second District held that an inadequate child support award could not be justified or sustained by reference to a spousal support award allegedly inflated to take advantage of federal tax laws on the theory that the total income to the custodial spouse is adequate for both the wife and the children. [Fn. ref. omitted.] * * *
>
> Ames' affirmation of the need for an adequate, separate child support award was incompatible with the "Lester" taxing scheme. * * *

The California legislature responded in 1981 by creating the concept of family support, which represents combined, but unallocated, child support and spousal support. See 1981 Cal. Stat. ch. 715, sec. 4 (adding former Cal. Civil Code sec. 4811(d)). The new California statutory provision effectively skirted the holding of In re Marriage of Ames, supra, by providing that a court need not make a separate order for child support when the parties use the family support technique.[10]

---

[10] That aspect of the 1981 legislation now appears in sec. 3586 of the California Family Code.

In 1984, Congress replaced the periodic payment/installment payment distinction contained in former section 71(a) and (c) with the four-pronged definition of alimony set forth in section 71(b)(1) (including the proscription of postdeath liability contained in subparagraph (D) thereof), reinforced by a recapture rule (section 71(f)) for "front-loaded" alimony.  Deficit Reduction Act of 1984, supra, sec. 422(a).  While the exception (to the general rule of inclusion) for amounts "fixed" as child support remained essentially unchanged, see sec. 71(c)(1), Congress did overturn the result in Commissioner v. Lester, supra, see sec. 71(c)(2) (reduction in support that is clearly associated with a contingency, specified in the divorce or separation instrument, that relates to a child will be treated as an amount fixed as payable for child support).  Lester continues, however, to stand for the proposition that, subject to section 71(c)(2), amounts will not be treated as child support for purposes of section 71 unless specifically designated as such in the governing divorce document.  See, e.g., Lawton v. Commissioner, T.C. Memo. 1999-243; Raymond v. Commissioner, T.C. Memo. 1997-219; Ambrose v. Commissioner, T.C. Memo. 1996-128.

As enacted, section 71(b)(1)(D) closed with the following parenthetical:  "(and the divorce or separation instrument states that there is no such liability)".  Congress dropped that requirement in 1986, see Tax Reform Act of 1986, Pub. L. 99-514, sec. 1843(b), 100 Stat. 2853, apparently "to mitigate the effects

of sloppy lawyering" by allowing "state law to 'save' alimony arrangements that meet all requirements of § 71(b)(1) except the explicit statement of termination upon death".  Hoover v. Commissioner, 102 F.3d 842, 846 (6th Cir. 1996), affg. T.C. Memo. 1995-183.  Accordingly, while we continue to consult the divorce documents first in determining a payor spouse's postdeath liability for purposes of section 71(b)(1)(D), e.g., Okerson v. Commissioner, 123 T.C. 258, 264 (2004), we may now look to applicable State law if those documents are inconclusive, e.g., Gilbert v. Commissioner, T.C. Memo. 2003-92, affd. sub nom. Hawley v. Commissioner, 94 Fed. Appx. 126 (3d Cir. 2004).

The California legislature has not made any changes in the California family support regime in response to Congress's 1984 and 1986 amendments to section 71.

    B.    <u>Continuing Payment Liability With Respect to Petitioner's Family Support Obligation</u>

        1.   <u>Overview</u>

Under this prong of section 71(b)(1)(D), we seek to determine whether Carmen's estate could enforce petitioner's family support obligation for any period after Carmen's death. See, e.g., Preston v. Commissioner, T.C. Memo. 1999-49 n.6, affd. in part, vacated and remanded in part on another issue 209 F.3d 1281 (11th Cir. 2000); Human v. Commissioner, T.C. Memo. 1998-106; Sugarman v. Commissioner, T.C. Memo. 1996-410; see also Geier, "Simplifying and Rationalizing the Federal Income Tax Law

Applicable to Transfers in Divorce", 55 Tax Law. 363, 398, 422, 427, 449 & n.325 (2002); McMahon, "Tax Aspects of Divorce and Separation", 32 Fam. L.Q. 221, 226 (1998).  As a practical matter, inasmuch as petitioner's family support obligation is otherwise open-ended (i.e., has no expressly specified term), the issue is whether that obligation would terminate automatically at Carmen's death or, alternatively, would remain enforceable by Carmen's estate until petitioner petitioned the Superior Court for relief.[11]

### 2. The Divorce Documents

### a. Scope of Inquiry

None of the Superior Court documents in the record (the divorce documents) addresses the contingency of Carmen's death.  However, inasmuch as the dissolution judgment incorporates the terms of petitioner's and Carmen's settlement agreement, petitioner seeks to introduce extrinsic evidence of his and Carmen's intent regarding the effect of Carmen's death on petitioner's family support obligation.  Petitioner's exhibit 5 is a transcript of a June 13, 1996, hearing in the Superior Court

---

[11] Although the period of any such interim enforceability presumably would be brief, any continuing payment liability with respect to a payment obligation is apparently sufficient to disqualify as alimony all payments made pursuant to that obligation, including payments made before the payee spouse's death.  See sec. 1.71-1T(b), Q&A-10, Temporary Income Tax Regs., 49 Fed. Reg. 34456 (Aug. 31, 1984).

that contains the following exchange between Carmen and her counsel:

> Q    And you understand that under this agreement, that the support of $4,030 payable by husband to you will be taxable to you?
>
> A    Yes.

Petitioner's exhibit 12 is a copy of Carmen's 1997 Federal income tax return, on which she reported $42,055 of "Other income", described as "Family Support received".

Respondent objects to petitioner's exhibits 5 and 12 on the ground of relevance. In essence, respondent argues that petitioner's and Carmen's belief or understanding that the payments would be taxable to Carmen, and Carmen's inclusion of the payments in the income reported on her 1997 tax return, have no bearing on the issue of petitioner's liability to continue making those payments in the event of Carmen's death. For the reasons discussed below, we shall sustain respondent's objection.

### b.   Extrinsic Evidence in General

Before we address respondent's relevance objection, we consider the larger issue of whether resort to extrinsic evidence of intent is appropriate in this case. In construing divorce documents under section 71(b)(1)(D) to determine the payor spouse's postdeath liability, we are generally prohibited from considering extrinsic evidence if the operative documents speak unambiguously to the matter. Okerson v. Commissioner, supra at 264. If the documents are silent or ambiguous, we may, to the

extent permissible under applicable State law principles,[12]

consider extrinsic evidence of the parties' intent regarding such

postdeath liability. See <u>Wells v. Commissioner</u>, T.C. Memo. 1998-

2; <u>Cunningham v. Commissioner</u>, T.C. Memo. 1994-474; cf. <u>Estate of

Craft v. Commissioner</u>, 68 T.C. 249, 263 (1977) (interpretation of

trust instrument), affd. 608 F.2d 240 (5th Cir. 1979).

The majority view in California appears to be that a marital

settlement agreement that has been incorporated into a judgment

is treated no differently from any other written agreement for

purposes of determining the admissibility of extrinsic evidence.

Vance & Pierson, Cal. Civ. Prac. Fam. Law Litig., sec. 8.72 (rev.

Oct. 2004); see, e.g., <u>In re Marriage of Simundza</u>, 18 Cal. Rptr.

3d 377, 380-381 (Ct. App. 2004); <u>In re Marriage of Trearse</u>, 241

Cal. Rptr. 257, 260-261 (Ct. App. 1987); but see <u>In re Marriage

of Benson</u>, 217 Cal. Rptr. 589, 591 (Ct. App. 1985). Accordingly,

inasmuch as the divorce documents do not address the effect of

Carmen's death on petitioner's family support obligation, we may

consider petitioner's exhibits 5 and 12 (offered to establish his

and Carmen's alleged understanding that the obligation would

---

[12] Although we apply the rules of evidence applicable in
trials without a jury in the U.S. District Court for the District
of Columbia, sec. 7453, it is well recognized that the so-called
"parol evidence rule" (limiting the role of extrinsic evidence of
intent in the interpretation of a written instrument) is a rule
of substantive law rather than a rule of evidence. <u>Estate of
Craft v. Commissioner</u>, 68 T.C. 249, 262-263 (1977), affd. 608
F.2d 240 (5th Cir. 1979).

terminate automatically at her death),[13] subject to respondent's relevance objection.

c.  Respondent's Relevance Objection

Evidence is relevant (and therefore generally admissible) if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed. R. Evid. 401 and 402.  If, however, the relevance of the evidence in question depends on the existence of some other fact, then the admissibility of such "conditionally relevant" evidence itself depends on the introduction of evidence sufficient to support a finding of the existence of that other fact.  See Fed. R. Evid. 104(b) and advisory committee's note.

The ultimate factual issue in this case is whether petitioner and Carmen intended the family support payments to terminate automatically at Carmen's death.  Petitioner's exhibits 5 and 12 certainly tend to increase the factual likelihood that he and Carmen intended the payments to qualify as alimony for

---

[13] We note that we would reach a different conclusion if the California Family Code required that any such understanding be in writing.  See In re Marriage of Trearse, 241 Cal. Rptr. 257, 259 (Ct. App. 1987) ("A limitation on the admissibility of extrinsic evidence to prove the intent of the parties to a marital settlement agreement has been recognized where a statute requires the parties to the agreement to state certain matters specifically in writing."); cf. Cal. Fam. Code sec. 4337 (West 2004), discussed infra (any agreement that a spousal support obligation will not terminate upon the death of the payee spouse must be in writing).

Federal income tax purposes.  However, that fact could be relevant to our ultimate factual determination (in that it would tend to show that petitioner and Carmen intended the payments to terminate automatically at Carmen's death) only if petitioner and Carmen knew their intended tax treatment depended on the effect of Carmen's death on petitioner's payment obligation.[14] Petitioner has offered no evidence that would support a finding of actual knowledge in that regard,[15] and we deem it inappropriate to impute such knowledge in this context.[16]  Cf.

_____

[14] We do not fail to recognize that, under the tax law in effect prior to 1984, we treated a "tax intent" clause in the divorce documents, providing that the payments would be fully taxable to the payee, as relevant to the classification of the payments for tax purposes.  See Stevens v. Commissioner, T.C. Memo. 1982-352, affd. 709 F.2d 12 (5th Cir. 1983).

[15] Assuming, for the sake of argument, that knowledge of petitioner's and Carmen's respective counsel could be ascribed to petitioner and Carmen for these purposes, the record contains no indication that their counsel knew the intended tax treatment depended on the effect of Carmen's death on petitioner's payment obligation.

[16] If taxpayers could rely on mutually intended tax consequences to establish an agreement satisfying sec. 71(b)(1)(D), then they could effectively "opt into" alimony treatment, a result we believe is not supported by the statute. See Geier, "Simplifying and Rationalizing the Federal Income Tax Law Applicable to Transfers in Divorce", 55 Tax Law. 363, 427 (2002) (while taxpayers can opt out of alimony treatment pursuant to sec. 71(b)(1)(B), they have no power to opt into alimony treatment under the statute); cf. Okerson v. Commissioner, 123 T.C. 258, 264-265 (2004) (rejecting the relevance of the State court's alleged intent that the payments at issue be deductible as alimony).

We do not mean to suggest, however, that evidence of intended tax consequences (and of tax reporting consistent with
(continued...)

Cunningham v. Commissioner, supra (knowledge of payee spouse's counsel that payor spouse intended to deduct payments at issue does not equate to knowledge that the payments were intended to terminate on the payee spouse's death).[17]  Accordingly, we sustain respondent's relevance objection and exclude from evidence petitioner's exhibits 5 and 12.  See Fed. R. Evid. 104(b).

      d.  Conclusion

The divorce documents do not address the contingency of Carmen's death, and petitioner has not offered any competent evidence of his and Carmen's intent in that regard.  We therefore turn to California law in order to determine the effect of Carmen's death on petitioner's family support obligation.

_____

[16](...continued)
that intent) can never be relevant to a determination of the intended scope of the payor's liability.  For example, a State court might find such evidence relevant in a suit by the payee's estate to enforce payment after the payee's death.

[17] In Cunningham v. Commissioner, T.C. Memo. 1994-474, we considered the weight to be afforded extrinsic evidence of intended tax consequences rather than the threshold issue of its admissibility.  Our observations therein are nonetheless instructive:

> If both parties * * * [wanted the payments to be deductible] and had understood the applicable tax requirements needed to make them deductible, we could infer that they intended the agreement to satisfy those requirements.  Because neither Mark nor * * * [his counsel] appears to have understood that new section 71 required the support payments to terminate in the event of the death of Shirley, we are unable to infer that they had considered that requirement when Mark signed the settlement agreement.  * * * [Emphasis added.]

### 3. Family Support Under California Law

#### a. Statutory Overview

The California Family Code (Family Code) defines "family support" as "an agreement between the parents, or an order or judgment, that combines child support and spousal support without designating the amount to be paid for child support and the amount to be paid for spousal support." Cal. Fam. Code sec. 92 (West 2004). As discussed supra pp. 11-12, the term entered the statutory lexicon in 1981 as the result of an attempt by the California legislature to reconcile principles of California child support law with Federal income tax law regarding the deductibility of payments to an ex-spouse. While portions of the Family Code are devoted exclusively to the well-established components of family support, see Cal. Fam. Code secs. 3900-4253, 4300-4360 (West 2004) (child support and spousal support, respectively), the Family Code contains no comprehensive set of rules relating to the newfangled amalgam. In particular, the Family Code does not specifically address the effect of the payee's death on a family support obligation.

#### b. Family Code Section 4337

Petitioner argues that Family Code section 4337, which generally operates to terminate spousal support upon the death of the payee spouse, is broad enough to include family support.[18]

---

[18] In Wells v. Commissioner, T.C. Memo. 1998-2, we
(continued...)

That section provides: "Except as otherwise agreed by the parties in writing, the obligation of a party under an order <u>for the support of the other party</u> terminates upon the death of either party or the remarriage of the other party." (Emphasis added.) Notwithstanding that Family Code section 4337 is contained in a portion of the Family Code (div. 9, pt. 3, secs. 4300-4360) entitled "Spousal Support",[19] petitioner argues that "if the legislature wanted the operation of Cal. Fam. Code section 4337 to be limited to spousal support, then 'spousal support' would have been used instead of 'support of the other party'."

To the extent petitioner is suggesting that the use of the phrase "support of the other party" in Family Code section 4337 reflects the drafters' intention to signify family support as well as spousal support, the history of the provision indicates otherwise. The reference in Family Code section 4337 to "support of the other party" dates from 1951, 30 years before the

---

[18](...continued)
concluded, without discussion, that Family Code sec. 4337 "pertains only to spousal support orders and * * * does not address family support payments." Contrary to petitioner's assertion, we did not conclude otherwise in <u>Ambrose v. Commissioner</u>, T.C. Memo. 1996-128.

[19] Family Code sec. 4330(a) provides that, in ordering a party to pay for the "support of the other party", the court is to "[take] into consideration the circumstances as provided in Chapter 2 (commencing with Section 4320)." Family Code sec. 4320 lists circumstances the court is to consider "[i]n ordering spousal support under this part".

California legislature created the concept of family support. See <u>Hilton v. McNitt</u>, 315 P.2d 1, 3 (Cal. 1957); see also 1951 Cal. Stat. ch. 1700, sec. 7. Prior to 1951, the then-existing statutory predecessor of Family Code section 4337, former California Civil Code section 139, was phrased in terms of the husband's obligation to support the wife. <u>Taliaferro v. Taliaferro</u>, 270 P.2d 1036, 1039 (Cal. Dist. Ct. App. 1954); see Cal. Civ. Code sec. 139, as amended by 1933 Cal. Stat. ch. 412, sec. 1.[20] The broadening of the statutory language in 1951 simply rendered the obligation of spousal support gender-neutral. See <u>Franklin Life Ins. Co. v. Kitchens</u>, 57 Cal. Rptr. 652, 657 (Ct. App. 1967); <u>Newhall v. Newhall</u>, 321 P.2d 818, 822 (Cal. Dist. Ct. App. 1958).

c.    <u>Other Family Code Provisions</u>

Notwithstanding the foregoing, other provisions of the Family Code display the intention of the California legislature that family support qualify as deductible alimony under Federal income tax law. See, e.g., Cal. Fam. Code sec. 4066 (West 2004) (orders complying with the statewide uniform guideline for child support may be phrased in terms of family support "as long as the amount is adjusted to reflect the effect of additional

---

[20] Former Cal. Civ. Code sec. 139 is the immediate statutory predecessor of former Cal. Civ. Code sec. 4801(b), which is the immediate statutory predecessor of Family Code sec. 4337.

deductibility").[21]  Accordingly, one could argue that the Family Code should be interpreted consistently with that intent whenever (as is the case with Family Code section 4337) such an interpretation would not do violence to the plain language of the statute.  Cf. Cal. Fam. Code sec. 4075 (West 2004) (provisions regarding the statewide uniform guideline for child support "shall not be construed to affect the treatment of spousal support and separate maintenance payments pursuant to Section 71 of the Internal Revenue Code of 1954").  Because, as discussed <u>infra</u>, we conclude that petitioner's family support payments qualify as deductible alimony without regard to Family Code section 4337, we need not decide whether a California court would adopt that interpretive approach.

     d.  <u>Caselaw</u>

Neither party cites, nor are we aware of, any California cases addressing the issue of whether, absent an agreement of the parties or a directive in the divorce decree, an obligation to pay family support terminates upon the death of the payee spouse. Petitioner draws support from <u>Danz v. Danz</u>, 216 P.2d 162 (Cal. Dist. Ct. App. 1950), and <u>Hale v. Hale</u>, 45 P.2d 246 (Cal. Dist. Ct. App. 1935), cases in which the court limited enforcement of an unallocated support award to amounts that had accrued prior to the payee spouse's remarriage.  While those cases are somewhat

---

[21] California enacted its statewide uniform guideline for child support in 1993.  See 1993 Cal. Stat. ch. 219, sec. 138.

analogous to this case, we think a more instructive case is <u>In re Marriage of Benjamins</u>, 31 Cal. Rptr. 2d 313 (Ct. App. 1994). That case involved a payor spouse's obligation under a marital settlement agreement (the terms of which were incorporated in the divorce decree) to pay the payee spouse, on or before September 1, 1991, an amount equal to her medical insurance premium for the 1-year period commencing on that date. Although the payee spouse died in April 1991, her daughter, as successor in interest, demanded payment of the premium amount ($13,140) under threat of legal action. The payor spouse paid the premium amount and then petitioned the court for reimbursement. The court held for the payor spouse, reasoning that the obligation was in the nature of spousal support which, pursuant to Family Code section 4337, terminated at the payee spouse's death. <u>Id.</u> at 317.

We believe a California court would similarly reject any attempt by Carmen's successor in interest (e.g., her estate) to enforce petitioner's family support obligation for any period after Carmen's death. Family support quite simply consists of spousal support and child support, and it is well settled under California law that a child support obligation runs to the child and not to the payee spouse. <u>In re Marriage of Comer</u>, 59 Cal. Rptr. 2d 155, 160 (1996); see also <u>Keith G. v. Suzanne H.</u>, 72 Cal. Rptr. 2d 525, 529 (Ct. App. 1998); <u>In re Marriage of McCann</u>, 32 Cal. Rptr. 2d 639, 642 (Ct. App. 1994); Hogoboom & King, Cal.

Prac. Guide: Fam. Law, sec. 18:40 (2004 ed.).[22]  It logically follows that Carmen's interest in petitioner's family support obligation, like the payee spouse's interest in the premium obligation at issue in In re Marriage of Benjamins, supra, is in the nature of spousal support.  Her interest in the award would therefore terminate at her death, leaving her successor without an enforceable interest.

### 4.  Conclusion

We conclude that petitioner's family support obligation does not entail continuing payment liability as contemplated in section 71(b)(1)(D).

### C.  Substitute Payment Liability With Respect to Petitioner's Family Support Obligation

### 1.  Overview

Under this prong of section 71(b)(1)(D), we look beyond the issue of continuing enforceability in search of any payment obligation after Carmen's death that would, in substance, represent a continuation (in whole or in part) of petitioner's family support payments.  See sec. 1.71-1T(b), Q&A-14, Temporary Income Tax Regs., 49 Fed. Reg. 34456 (Aug. 31, 1984) (determination of whether payments commencing, increasing, or accelerating upon the death of the payee spouse are a substitute

---

[22] As discussed infra, the child support component of petitioner's family support obligation is more relevant to our inquiry regarding substitute (as opposed to continuing) payment liability.

for the continuation of payments ostensibly terminating at that time depends on all of the facts and circumstances).

### 2. Okerson v. Commissioner

Our recent opinion in Okerson v. Commissioner, 123 T.C. 258 (2004), nicely illustrates the operation of the substitute payment clause of section 71(b)(1)(D).  The divorce decree in that case required Mr. Okerson to pay Mrs. Okerson $117,000 "as alimony necessary for her support" in varying installments over a period of approximately 10 years.  Id. at 259-260.  Although the decree specified that "[s]aid alimony" would terminate upon Mrs. Okerson's death, another provision obligated Mr. Okerson to pay the remaining installments in that event "for or on behalf of the education of the parties' two children".  Id. at 260.  A subsequent decree required Mr. Okerson to pay Mrs. Okerson's attorney $33,500 on Mrs. Okerson's behalf "as alimony necessary for her support" over a period of 41 months.  Id.  That decree similarly provided that "[s]aid alimony" would terminate upon Mrs. Okerson's death, in which case the remaining installments would be payable directly to her attorney.  Id. at 260-261.  We concluded that both postdeath obligations were substitute payment liabilities, as contemplated in section 71(b)(1)(D), with respect to the payments to Mrs. Okerson labeled as "alimony" and that, consequently, the payments to Mrs. Okerson failed to qualify as deductible alimony.  Id. at 267-268; see also sec. 1.71-1T(b), Q&A-14, Examples (1) and (2), Temporary Income Tax Regs., supra.

### 3.   The Child Support Obligation Embedded in Family Support

Unlike Okerson v. Commissioner, supra (as well as the above-cited examples in respondent's temporary regulations), this case does not involve language in a divorce decree that can be construed as imposing a substitute payment obligation with respect to the payments at issue. Rather, the issue in this case is whether we can infer a substitute payment obligation with respect to petitioner's family support payments on the basis of their undesignated child support component. While spousal support generally terminates on the death of the payee spouse, Cal. Fam. Code sec. 4337 (West 2004), a parent's duty to support his or her child generally continues until the child's emancipation, Cal. Fam. Code secs. 3900, 3901 (West 2004). Arguably, then, petitioner's potential liability for child support payments in the event of Carmen's death represents a substitute payment obligation with respect to a corresponding portion of his family support payments.

We essentially adopted the foregoing analysis in Wells v. Commissioner, T.C. Memo. 1998-2. In that case, which respondent urges us to follow, we sustained the Commissioner's determination that the taxpayer's family support payments did not satisfy section 71(b)(1)(D), relying in part on the following reasoning:

Assuming a "worst case scenario" (i.e., custodial parent dies and custody is awarded to someone other than the surviving spouse), we cannot believe that California law would permit the surviving parent to avoid any further support obligations.  * * *

See also Hawley v. Commissioner, 94 Fed. Appx. 126 (3d Cir. 2004) (citing the Pennsylvania equivalent of Cal. Fam. Code secs. 3900 and 3901 for the proposition that "[e]ven if the technical obligation to make [unallocated support] payments under the order to [Ms.] Gilbert would have ended upon her death, the obligation to make substitute payments would have continued because Hawley would still have been required to support his children"), affg. Gilbert v. Commissioner, T.C. Memo. 2003-92.

Petitioner, on the other hand, urges us to reject Wells v. Commissioner, supra.  He argues, among other things, that "none of the payments made by Petitioner can be considered 'child support' pursuant to either section 71(c)(1) or 71(c)(2) and, therefore, the payments qualify as alimony under section 71(a)."  That aspect of petitioner's argument underscores the incompatibility of the expansive reading of section 71(b)(1)(D) in Wells and the narrow reading of section 71(c)(1)'s predecessor in Commissioner v. Lester, 366 U.S. 299 (1961).  Under the worst case scenario approach of Wells (which assumes that someone other than the payor spouse would take custody of the children upon the payee spouse's death), the substitute payment clause of section 71(b)(1)(D) will invariably render the child support element of unallocated support nondeductible, solely on the basis of the payor's general State

law obligation to support his or her children (i.e., through payments to the presumed successor custodian).[23]  In contrast, Lester stands for the principle, subject now to section 71(c)(2), that only amounts specifically designated as child support in the divorce decree will be treated as nondeductible child support under section 71(c)(1).[24]  See Lawton v. Commissioner, T.C. Memo. 1999-243 (rejecting the argument that Pennsylvania's child support guidelines effectively "fix" a portion of an unallocated support obligation as child support within the meaning of section 71(c)(1)); see also Simpson v. Commissioner, T.C. Memo. 1999-251 (same).

This Court has never squarely addressed and resolved the tension between section 71(b)(1)(D) and (c)(1) in the context of unallocated support obligations.[25]  For the reasons discussed

---

[23] We are not aware of any jurisdiction in the United States that does not impose a general obligation on parents to support their minor children.

[24] Sec. 71(c)(2) provides that a reduction in support that is clearly associated with a contingency, specified in the governing divorce document, that relates to a child will be treated as an amount fixed as payable for the support of children within the meaning of sec. 71(c)(1).  See supra p. 13.

[25] Compare Wells v. Commissioner, T.C. Memo. 1998-2, Gilbert v. Commissioner, T.C. Memo. 2003-92, affd. sub nom. Hawley v. Commissioner, 94 Fed. Appx. 126 (3d Cir. 2004), and Miller v. Commissioner, T.C. Memo. 1999-273, affd. sub nom. Lovejoy v. Commissioner, 293 F.3d 1208 (10th Cir. 2002), with Ambrose v. Commissioner, T.C. Memo. 1996-128, and Heller v. Commissioner, T.C. Memo. 1994-463, affd. in part and remanded in part 78 AFTR 2d 96-7610, 97-1 USTC par. 50,193 (9th Cir. 1996). See also Kean v. Commissioner, T.C. Memo. 2003-163; Murphy v.
(continued...)

below, we resolve this tension by rejecting the interpretation of section 71(b)(1)(D) inherent in the worst case scenario approach of <u>Wells v. Commissioner</u>, <u>supra</u>. Specifically, we reject the notion that the applicability of section 71(b)(1)(D) to an unallocated support obligation is to be determined by invariably assuming that a third party would take custody of the children upon the payee spouse's death, thereby ensuring the existence of a substitute payment obligation.[26]

_____

[25](...continued)
<u>Commissioner</u>, T.C. Memo. 1996-258.

    Petitioner has brought to our attention that the conflict in the authorities has not gone unnoticed. See Udrys, "California Family Support: Tax Consequences after <u>Wells v. Commissioner</u>", 41 Orange County Law. 36, 41 (1999). See also the comment of the Court of Appeals in <u>Lovejoy v. Commissioner</u>, <u>supra</u> at 1211:

        There is no Colorado law squarely addressing the
        treatment of unallocated payments upon the death of the
        payee spouse. The only on-point cases cited by the
        parties address California law and are conflicting.
        Compare <u>Heller v. Commissioner</u>, 103 F.3d 138, 1996 WL
        713049, at *3 (9th Cir. 1996) (unpublished) (holding
        that the obligation to pay unallocated support would
        automatically terminate upon the recipient's death),
        and <u>Ambrose v. Commissioner</u>, 71 T.C.M. (CCH) 2429 (Mar.
        14, 1996) (same), with <u>Wells v. Commissioner</u>, 75 T.C.M.
        (CCH) 1507 (Jan. 5, 1998) (holding that the obligation
        does not terminate upon death). This split of
        authority interpreting California law is no help to
        Lovejoy's attempt to show that Colorado law provides
        for the termination of unallocated payments upon the
        payee spouse's death.

[26] We observe that the unpublished opinion of <u>Heller v. Commissioner</u>, <u>supra</u>, by the Court of Appeals for the Ninth Circuit is not binding precedent in the Ninth Circuit (to which an appeal in this case would lie). See 9th Cir. R. 36-3(a).

(continued...)

        4.    The Case Against the Worst Case Scenario Approach

        a.    General Principles of Statutory Construction

The worst case scenario approach of Wells v. Commissioner, T.C. Memo. 1998-2, renders section 71(c)(1) largely superfluous, in violation of the general premise that "'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting Market Co. v. Hoffman, 101 U.S. 112, 115-116 (1879)).  Specifically, if the general State law obligation to support one's children were the functional equivalent of a substitute payment obligation in every case (as would obtain if one must assume that someone other than the payor spouse would take custody of the children upon the payee spouse's death), then the only amounts that section 71(c)(1) could, to the exclusion of section 71(b)(1)(D), render nondeductible would be amounts "fixed" as child support (taking into account section 71(c)(2)) in excess of the amount of the general State law obligation.[27]  Cf. TRW, Inc. v.

_____

        [26](...continued)
Accordingly, we need not decide whether the doctrine of Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), would require us to follow Heller.

        [27] Presumably, the amount of the State law obligation would be determined by reference to the child support guidelines enacted by the State in compliance with Federal law.  See 42 U.S.C. sec. 667 (2000); cf. Lawton v. Commissioner, T.C. Memo. 1999-243 (rejecting payee spouse's attempt to identify child support element of unallocated support payments by reference to
                                                    (continued...)

Andrews, 534 U.S. 19, 29 (2001) (rejecting Andrews's "attempt to generate some role for the express exception [in the statute] independent of that [which would be] filled by" the rule of general application she asked the Court to read into the statute); Anderson v. Commissioner, 123 T.C. 219, 236-237 (2004) (rejecting an interpretation of section 3121(b)(20) that would have effectively denied its beneficial effects to most, if not all, small fishing boat owners who are the intended beneficiaries of the provision).

Expanding the reach of section 71(b)(1)(D) to the extent suggested by the worst case scenario approach also runs contrary to the maxim that a specific provision controls over a general one, particularly when the two are interrelated and closely situated in the statute. E.g., HCSC-Laundry v. United States, 450 U.S. 1, 6 (1981) (analyzing section 501(c)(3) and (e)). Inasmuch as section 71(c)(1), but not section 71(b)(1)(D), specifically addresses child support, the foregoing rule of construction militates against an interpretation of section 71(b)(1)(D) which, contrary to the specific designation principle of section 71(c)(1), invariably has the effect of converting undesignated support into child support.

b. Legislative History of the 1984 Act

Notwithstanding the foregoing, the intent of the drafters is

---

[27](...continued)
Pennsylvania's child support guidelines).

paramount, and, if extrinsic evidence of that intent were to contradict the implications of the general principles discussed above, the former would control. E.g., Beam v. IRS, 192 F.3d 941, 945 (9th Cir. 1999) (although "specific statutes normally trump conflicting, general statutes", appellants' argument relying on that general principle "ignores the specifically stated intent of Congress"). Having said that, we see nothing in the legislative history of the 1984 Act indicating that, in enacting section 71(b)(1)(D), Congress intended to abandon the specific designation principle of section 71(c)(1). Any inference to that effect is particularly unwarranted in light of the fact that Congress crafted a narrow exception to that principle as part of the same legislation. See sec. 71(c)(2), supra note 24; cf. Chiles v. United States, 843 F.2d 367, 370 (9th Cir. 1988) ("We cannot conclude that Congress chose to repeal [I.R.C.] § 2056(c) expressly and left § 2056(b)(4)(A) intact only to effectuate its repeal by implication.").

To be sure, Congress did contemplate that section 71(b)(1)(D) could, in derogation of the specific designation principle of section 71(c)(1), render excludable (and therefore nondeductible) the portion of a payment that, in substance but not in form, represents child support:

> A provision for a substitute payment, such as an
> additional amount to be paid as child support after the
> death of the payee spouse will prevent a corresponding
> amount of the payment to the payee spouse from
> qualifying as alimony. * * *

H. Rept. 98-432 (Part 2) at 1496 (1984) (the 1984 House Report).[28] That example, however, like section 71(c)(2), represents only a limited departure from the specific designation principle in that it relies on other language in the governing instrument.  See also Okerson v. Commissioner, 123 T.C. 258 (2004) (finding substitute payment obligation based on provision in the divorce decree requiring payments for children's education in the event of payee spouse's death); sec. 1.71-1T(b), Q&A-14, Example (1), Temporary Income Tax Regs., supra (finding substitute payment obligation based on provision in the divorce decree requiring payments to children's trust in the event of payee spouse's death).  Indeed, the example in the 1984 House Report can be viewed as a corollary of section 71(c)(2); that is, a provision for additional or increased child support that is contingent upon the supported spouse's death is simply the flip side of a provision for decreased spousal support that is contingent upon the death or emancipation of a child.

  c. 1986 Amendment of Section 71(b)(1)(D)

  Finally, one can draw a negative inference from the 1986 repeal of the requirement that the "termination at death"

---

 [28] That example appears to recharacterize alimony as child support, notwithstanding that the report elsewhere provides that the "bill attempts to define alimony in a way that would conform to general notions of what type [sic] of payments constitute alimony as distinguished from property settlements".  H. Rept. 98-432 (Part 2) at 1495 (1984) (emphasis added); see discussion supra pp. 9-10, 12-13.

condition of section 71(b)(1)(D) be contained in the governing instrument.  See supra pp. 13-14.   As we have previously observed in that regard:

> If Congress had intended that State law could fix the amount of child support payments where such amounts are not fixed by the terms of the divorce or separation instrument, it certainly could have made a similar change in the wording of section 71(c)(1).  We conclude from the absence of such a change that Congress did not intend the interpretation that petitioner advocates.
> * * *

Lawton v. Commissioner, T.C. Memo. 1999-243.  As noted above, the payee spouse taxpayer in that case argued (unsuccessfully) that Pennsylvania's child support guidelines operated to "fix" a portion of an unallocated support obligation as child support within the meaning of section 71(c)(1).  We similarly conclude that Congress did not intend the interpretation of section 71(b)(1)(D) suggested by the worst case scenario approach of Wells v. Commissioner, T.C. Memo. 1998-2.

        d.   Conclusion

We reject the notion that one must assume a worst case scenario (under which someone other than the payor spouse would take custody of the children upon the death of the payee spouse) in determining the applicability of the substitute payment clause of section 71(b)(1)(D) to an unallocated support obligation. Accordingly, we hold that a payor spouse's general State law obligation to support his or her children, without more, does not cause any or all of that spouse's unallocated support obligation

to fail to qualify as alimony by reason of the substitute payment clause of section 71(b)(1)(D).

     5.    <u>No Substitute Payment Liability Attributable to the Embedded Child Support Obligation</u>

We need not decide whether a general State law obligation to support one's children, when viewed in conjunction with additional statutory provisions of the jurisdiction in question or the facts of a particular case, could form the basis of a substitute payment obligation under section 71(b)(1)(D). That is, even if there may be circumstances in which such an obligation could have implications under section 71(b)(1)(D), we are satisfied they are not present in this case.

Under California law, a surviving parent is entitled to custody of his or her children, Cal. Fam. Code sec. 3010(b) (West 2004), even if the predeceasing parent had been awarded sole custody. <u>In re Guardianship of Donaldson</u>, 223 Cal. Rptr. 707, 708-709 (Ct. App. 1986); see Hogoboom & King, Cal. Prac. Guide: Fam. Law, sec. 17:247 (2004 ed.). Accordingly, even if petitioner had not been awarded joint legal and joint physical custody of the children, he would be entitled to immediate custody upon Carmen's death. Compare N.J. Stat. Ann. sec. 9:2-5 (West 2002) (upon the death of the custodial parent, the care and custody of the children "shall not revert to the surviving parent without an order or judgment of the Superior Court to that effect"). It follows that there would be no interim period during which

petitioner might be required, pending judicial action, to make payments to a de facto custodian in discharge of his general State law obligation to support the children.[29]

A third party could defeat petitioner's initial custody right only by going to court and demonstrating that petitioner's custody would be detrimental to the children and that a change in custody is required to serve the best interest of the children.  See Cal. Fam. Code sec. 3041 (West 1994); Hogoboom & King, supra, sec. 17:247.  As noted above, the Superior Court awarded petitioner joint physical, as well as joint legal, custody of the children, and the 1999 order indicates that petitioner's "share" of physical custody at that time was 42 percent.  In the absence of any evidence that (notwithstanding such court-approved custody) a third party would have had grounds to challenge petitioner's custody rights had Carmen died, we have no reason to believe that anyone other than petitioner would be entitled to physical custody of the children for periods after Carmen's death.  Absent a successor payee, petitioner would have no substitute payment liability with respect to the child support element of his family support obligation.  See Kean v. Commissioner, T.C. Memo. 2003-163

-----

[29] As we observed in Cunningham v. Commissioner, T.C. Memo. 1994-474, if a payor spouse is required "to make even one otherwise qualifying payment after the death of the payee spouse, none of the related payments required before the payee spouse's death will be alimony."  See Okerson v. Commissioner, 123 T.C. 258, 267 (2004); sec. 1.71-1T(b), Q&A-13, Temporary Income Tax Regs., supra; cf. supra note 11.

(applying section 71(b)(1)(D) to unallocated support ordered by New Jersey court; inasmuch as Mr. and Ms. Kean shared physical custody of the children, "there would be no logical reason for the New Jersey court to order that Mr. Kean continue to pay support or for the New Jersey court to order any payment as a substitute for the unallocated support" had Ms. Kean died).

We reach the foregoing conclusion without regard to whether, as is apparently the case with California child support orders, see In re Marriage of McCann, 32 Cal. Rptr. 2d 639, 641 (Ct. App. 1994), the controlling order would technically remain in effect after Carmen's death until petitioner obtained its (prospective) judicial termination. Cf. In re Marriage of Trainotti, 261 Cal. Rptr. 36, 38 (Ct. App. 1989) (payee under child support order sought to collect amounts that had accrued during the period between payor's assumption of sole physical custody of the child and the judicial termination of the child support order 10 months later; trial court "erred by refusing to consider whether appellant [the payor] had satisfied his obligation by furnishing Christopher [the minor child], with the approval of his former wife, a home and support that was equal to or in excess of the court-ordered amount");[30] Jackson v. Jackson, 124 Cal. Rptr. 101

_____

[30] Although the court may have viewed such direct expenditures as the functional equivalent of payments under the child support order, neither party suggests that, for purposes of the substitute payment clause of sec. 71(b)(1)(D), hypothetical direct expenditures on behalf of children in one's custody (i.e.,

(continued...)

(Ct. App. 1975) (similar).

D.   Conclusion--Deductibility of Family Support Payments

Given the lack of continuing payment liability and substitute payment liability with respect to petitioner's family support obligation, the family support payments at issue satisfy the requirements of section 71(b)(1)(D).  Because the parties do not dispute the applicability of section 71(b)(1)(A)-(C) to those payments, and respondent does not argue any other grounds for nondeductibility (e.g., section 71(c)(1)), petitioner is entitled to deduct the entire amount of family support payments he made to Carmen in 1999 ($49,808).[31]

E.   Payments to Drs. Caffaro and Murphy

1.   Procedural Issue

Petitioner's petition did not include a claim that he is

_____

[30](...continued)
following the payee spouse's putative death) should be treated the same as hypothetical payments to a successor custodian.  We would reject any such expansive reading of sec. 71(b)(1)(D) for the same reasons we reject the expansive reading suggested by Wells v. Commissioner, T.C. Memo. 1998-2.  See supra pp. 32-36.

[31] We recognize that, if Carmen died, petitioner conceivably could be liable to her estate for at least some portion of his family support arrearage.  If that were so, then the portion of petitioner's 1999 payments to Carmen constituting arrears ($3,824) arguably would fail to satisfy sec. 71(b)(1)(D). However, under well-established caselaw involving pre-1984 sec. 71, payments of alimony arrearages retained the character of the payments originally due.  See, e.g., Olster v. Commissioner, 79 T.C. 456, 462 (1982), affd. 751 F.2d 1168 (11th Cir. 1985). Absent any indication in the legislative history of the 1984 Act that Congress intended to change that result, we believe the same principle would apply under post-1984 sec. 71.

entitled to a deduction for alimony in excess of the amount claimed on his 1999 return and disallowed by respondent ($50,528), nor did he move for leave to amend the petition to include such a claim.  See Rule 41(a).  Normally, we do not consider issues not raised in the pleadings.  E.g., Christensen v. Commissioner, T.C. Memo. 1996-254 n.1, affd. without published opinion 142 F.3d 442 (9th Cir. 1998); see Rule 34(b)(4).  However, the parties' stipulations reflect both the claim for an increased deduction ($54,110) and the basis for that claim (i.e., the amounts paid to Drs. Caffaro and Murphy), and respondent addressed the issue in his reply brief.  Accordingly, we shall treat petitioner's claim for an increased alimony deduction as having been tried by consent of the parties.  See Rule 41(b); see also Certified Grocers of Cal., Ltd., v. Commissioner, 88 T.C. 238, 246 n.17 (1987) (application of Rule 41(b) in the context of a fully stipulated case).

### 2.  Substantive Analysis

The record reveals no factual predicate for petitioner's claim that his payments to Drs. Caffaro and Murphy in 1999 ($4,188 + $114 = $4,302) qualify as deductible alimony.  In order so to qualify, such payments would have to have been made "under a divorce or separation instrument".  Sec. 71(b)(1)(A); see sec. 71(b)(2).  Neither the dissolution judgment, the 1999 order, nor any other document contained in the record (including the parties' stipulations) reveals any obligation of petitioner to make

payments to Drs. Caffaro and Murphy.[32] We therefore conclude that petitioner's payments to Drs. Caffaro and Murphy in 1999 ($4,302) do not qualify as alimony deductible in 1999.

The fact that the Superior Court subsequently credited (in 2001) the bulk of the Caffaro/Murphy payments ($4,188) to petitioner's family support arrearage does not help his case. Petitioner apparently assumes that if the family support he paid Carmen in 1999 pursuant to the 1999 order qualifies as deductible alimony, then any other 1999 outlay credited in a later year against his family support arrearage must be deductible in 1999 as well. If that is his position,[33] we are not aware of any authority to support it. Cf. Eboli v. Commissioner, 93 T.C. 123, 131-132 (1989) (rejecting Commissioner's argument that, because overpayment credited in 1979 against cash basis taxpayer's liability for interest on 1970 deficiency was attributable to payments made in 1975, such deficiency interest was properly deductible in 1975).

### 3. Conclusion

We hold petitioner is not entitled to any alimony deduction for 1999 in respect of his payments to Drs. Caffaro and Murphy.

---

[32] Furthermore, the parties' stipulations do not indicate that petitioner made the October 1999 payment to Dr. Caffaro ($114) on Carmen's behalf. See sec. 71(b)(1)(A).

[33] Despite having effectively put the issue in play, see supra pp. 40-41, petitioner did not separately address on brief the deductibility of the Caffaro/Murphy payments credited to his arrearage.

II.  Late Filing Addition to Tax

Respondent determined that petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file timely his 1999 return.  Section 6651(a)(1) imposes an addition to tax for failing to file a return on or before the specified filing date unless it is shown that such failure is due to reasonable cause and not due to willful neglect.  Once the Commissioner demonstrates the appropriateness of imposing the addition to tax, thereby satisfying his initial burden of production under section 7491(c), the taxpayer bears the burden of proving the applicability of the exception for reasonable cause and lack of willful neglect.  See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

The parties stipulated that petitioner did not file his 1999 return until August 2, 2001, and that petitioner did not seek, nor was he granted, an extension of time to file that return.  Accordingly, respondent has met his burden of production.

To prove reasonable cause, petitioner must show he exercised ordinary business care and prudence and was nevertheless unable to file his 1999 return within the prescribed time.  Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. 89, 109 (2003); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Petitioner asserts that the late filing of his 1999 return was due primarily to the fact that he was in the process of establishing a new business and was unable to assemble in a timely manner the necessary

documentation to support the business deductions claimed on the return.  There is no record evidence to support that assertion, and, even if there were, we are not persuaded that petitioner's preoccupation with establishing a new business would constitute reasonable cause for failure to file timely his 1999 return.  See Polsby v. Commissioner, T.C. Memo. 1998-459; Estate of Bevan v. Commissioner, T.C. Memo. 1989-256.

We uphold respondent's determination that petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file timely his 1999 return.  The correct amount of the addition to tax must be calculated as part of the Rule 155 computation.

To give effect to the foregoing,

Decision will be entered

under Rule 155.